IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

A-1 MORTGAGE CORPORATION,

      Plaintiff,                                     06cv0338

v.                                                  Electronically Filed

DAY ONE MORTGAGE, LLC, ET AL.,

      Defendants.

## Memorandum Opinion

**I.   Introduction**

This is an action for trade mark/trade name infringement. Plaintiff, A-1 Mortgage Corporation, alleges that defendants violated the Lanham Act, 15 U.S.C. § 1125(a), by causing confusion and/or the likelihood of confusion with plaintiff's trade name and trade marks. Plaintiff seeks a permanent injunction as well as damages, attorney's fees and costs. Currently pending before this Court is plaintiff's motion for summary judgment, with supporting brief (doc. nos. 67 and 68). For the reasons that follow, this Court will grant plaintiff's motion for summary judgment (doc. no. 67).

**II.  Factual Background**

The facts, as set forth in plaintiff's motion for summary judgment, are as follows:[1]

    1.    A-1 Mortgage is a Pennsylvania Corporation, which provides mortgage brokerage and financial services.

    2.    A-1 Mortgage is the exclusive owner of the trademark, "A-1 Mortgage," which is

---

[1] Defendants have not participated in this case since August 11, 2006 (see doc. no. 41), when defense counsel filed a motion to withdraw as counsel. Despite being ordered to respond to the instant motion for summary judgment by December 28, 2006 (see doc. no. 65), as well as many other motions, defendants have failed to do so. Therefore, this Court will accept the facts set forth in plaintiff's motion for summary judgment as uncontroverted.

registered for the provision of mortgage brokerage and financial services under Pennsylvania Trademark Registration No. 3011052.

3.  A-1 Mortgage provides mortgage brokerage and financial services to consumers under the trade names "A-1," "A-1 Mortgage" and "A-1 Mortgage of Cranberry."

4.  Continuously since April 1996, A-1 Mortgage has provided mortgage brokerage and financial services under the above trade names to the targeted markets of Cranberry Township and the Pittsburgh metropolitan area of Western Pennsylvania.

5.  Since April 1996, Plaintiff has expended in excess of four million dollars promoting its name and services through extensive advertising, including radio, television, print, and on the internet.

6.  A-1 Mortgage has an internet presence through a website registered to A-1 Mortgage. The website serves several integral functions: (1) it provides information about A-1 Mortgage to the internet-using public, (2) it enables consumers to complete forms to apply for mortgages through A-1 Mortgage on the internet, and (3) it allows consumers to receive e-mail responses to their applications.

7.  A-1 Mortgage has advertised in other states and the media forms used by A-1 Mortgage's advertising cross state lines.

8.  A-1 Mortgage has become widely known to mortgage consumers and in the mortgage brokerage industry beyond the boundaries of the Western District of Pennsylvania and the Commonwealth of Pennsylvania, primarily through the use of various forms of media, including radio and cable television advertising, as well as its internet presence.

9.  A-1 Mortgage provides quality mortgage brokerage and financial services to the

mortgage consuming public at large, and A-1 Mortgage has become known as a provider of quality mortgage brokerage and financial services in the Western Pennsylvania area, in neighboring states, and on the internet..

10. A-1 Mortgage intends to continue marketing its name and services and to continue to provide quality mortgage brokerage services to consumers through the trademark and trade names, "A-1 Mortgage," "A-1," and "A-1 Mortgage of Cranberry" indefinitely.

### Defendant Goldblum's employment with A-1 Mortgage Corporation

11. Defendant Zur Goldblum (hereinafter, "Goldblum") was a previous independent contractor/employee of A-1 Mortgage.

12. Goldblum was present in plaintiff's offices on a daily basis and had significant knowledge of the business of A-1 Mortgage, including office policies and procedures, clients and customer lists, sources of lending leads, lenders, and A-1 Mortgage's advertising and promotional campaigns, upon which his success as a mortgage broker depended in large part.

13. Goldbum was aware of the location of, and had access to, case files, customer lists, and other confidential and proprietary documents belonging to A-1 Mortgage Corporation within A-1's offices.

14. Goldblum also knew that "A-1 Mortgage" is a trademark belonging to A-1 Mortgage Corporation and that the company regularly advertised and presented itself to the public as "A-1 Mortgage."

15. Additionally, Goldblum knew that A-1 Mortgage was engaged in litigation to protect its trademark and trade names from infringement by another mortgage brokerage located in Western Pennsylvania.

16. In or about July, 2004, a civil suit was filed against A-1 Mortgage Corporation by Errika Wilford alleging various improprieties in her loan documents.

17. During the arbitration of that case on February 8, 2005, A-1 Mortgage became aware that Goldblum had knowingly falsified loan documents, resulting in Ms. Wilford's mortgage application being rejected by the lender, and Goldblum has admitted to the knowing falsification of Erikka Wilford's loan application.

18. As a result of Goldblum's actions, judgment was entered that same day against A-1 Mortgage Corporation and in favor of Errika Wilford. As such, Goldblum knew that his days at A-1 Mortgage Corporation were numbered.

**Defendant Goldblum's plan to wrongfully use the A-1 Mortgage name**

19. Approximately two weeks after the conclusion of the Wilford litigation, on February 24, 2005, Goldblum registered the domain name "firstdaymortgage.com" in anticipation of his departure from A-1 Mortgage.

20. Goldblum then proceeded to surreptitiously copy and remove confidential and proprietary materials from A-1 Mortgage without permission, including confidential customer information and records.

21. Goldblum copied and took the documents for his own personal benefit without the permission of plaintiff or the customers.

22. At the end of March, 2005, Goldblum left A-1 Mortgage and opened his business within thirty (30) miles of plaintiff.

23. Notably, Goldblum decided to move from the "non-confusing" First Day Mortgage name, to instead do business using the confusingly similar Day One Mortgage name.

24. Goldblum registered the domain name "day1mortgage.com" on March 31, 2005, and he registered the name Day One Mortgage LLC with the Commonwealth of Pennsylvania on about April 15, 2005.

25. Goldblum then proceeded to operate his new business using the day1mortage.com website.

26. Of the countless names available to Goldblum, he chose to use a phonetic mirror to A-1 Mortgage, even though he knew that there was a significant likelihood of customer confusion.

### Goldblum contacts A-1 Mortgage Customers

27. Goldblum began contacting A-1 Mortgage customers directly from records he had wrongfully taken from A-1 Mortgage, and on September 7, 2005, in an email Goldblum sent to the President of A-1 Mortgage's husband, Goldblum admitted to doing so.

28. In January/February, 2006, despite knowing that A-1 Mortage conducted extensive radio advertising, specifically on "BOB FM", Goldblum authorized running his sound-alike advertisement on BOB FM.

29. John Coyne, plaintiff's long-time advertising consultant, alerted the president of A-1 Mortgage Corporation, that sound-alike ads were being run on the radio by Day One Mortgage.

30. In his affidavit, Mr. Coyne stated that one radio ad was so similar that he, who has 46 years experience in advertising, was confused by it.

31. According to his affidavit, in or about January or February, 2006, Mr. Coyne heard a radio commercial on 96.9 FM (Bob), that he first thought was an A-1 Mortgage

5

commercial "live read." Only after hearing the advertisement several times, did Mr. Coyne recognize that it was not for A-1, but rather was Day One Mortgage.

32. The advertisement Coyne heard used substantially identical "copy" to that which he had developed for A-1 Mortgage. For example, like the A-1 Mortgage advertisement, the Day One Mortgage advertisement stated, "we'll take you from application to closing in two to three weeks."

33. According to Mr. Coyne, the names and advertisements are confusingly similar.

### Defendants' profit from their infringement

34. Goldblum represented to customers that Day One Mortgage and A-1 Mortgage were the same and/or affiliated.

35. Goldblum did not know whether the customers whose loans he closed while working at/or operating Day One Mortgage were confused by the name "Day One Mortgage" with plaintiff's trademark, "A-1 Mortgage."

36. Goldblum also did know whether the customers whose loans he closed while working at/or operating Day One Mortgage were actually trying to close loans with A-1 Mortgage.

37. Goldblum witnessed at least one case or incident of actual customer confusion between Day One Mortgage and plaintiff's trademark, "A-1 Mortgage."

38. Goldblum/Defendants benefitted from customer confusion, in the form of business and profits, due to customer confusion between Day One Mortgage and plaintiff's trademark, "A-1 Mortgage."

39. During the relavant time period, the gross profits of defendants was, at a

minimum, $72,000.

40.     Plaintiff has been caused significant damages including costs in the approximate amount of $3,150.21 and attorney's fees in the approximate amount of $44,458.50 through the end of November and anticipated attorneys fees of an additional $13,775 for the month of December, for a total of $58,233.50.

**Goldblum's actions subsequent to the "Cease and Desist" Letter and during this Litigation**

41.     On January 11, 2006, Counsel for A-1 Mortgage Corporation sent a cease and desist letter to defendants; however, Goldblum continued to operate as he had being doing.

42.     On January 25, 2006, Goldblum "sold" his residence to his friend, Damian Holc, in an effort to make himself "judgment proof."

43.     Goldblum and his family, however, continued to reside in the house and pay monthly rent to the new "owner." Goldblum paid the new "owner" more in rent payments than he previously paid in mortgage payments.

44.     On or about May 18, 2006, this Court entered a preliminary injunction against defendants.

45.     Within approximately two weeks of this Court's ruling, Goldblum contacted the Department of Banking to complain about plaintiff, in an effort to further harm plaintiff.

46.     During the course of this litigation, defendants have refused to comply with discovery orders, Goldblum has refused to answer questions at his deposition, and prematurely left his deposition (and was then ordered to return to his deposition and answer questions by this Court - see doc. no. 38), and then plead the Fifth Amendment in response to certain questions upon his return.

47.     On September 18, 2006, the day before the scheduled deposition of Mr. Holc, Goldblum filed for bankruptcy and, despite no cancellation of that deposition, Damian Holc failed to appear for his subpoenaed deposition testimony.

### III.    Standard of Review

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted). In deciding a summary judgment motion, the court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-*

*Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004.)  *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party ).

**IV.   Discussion**

Plaintiff has moved for summary judgment and argues in support thereof that defendants conduct in this case violates the Lanham Act.  15 U.S.C. § 1125(a)(1999).  Section 1125 of the Lanham Act protects qualified federally unregistered trademarks from infringement, provided that interstate commerce is involved.

In order to set forth a valid trademark claim under the Lanham Act, plaintiff must

establish that the marks are valid and legally protectable; (2) the marks are owned by plaintiff; and, (3) defendants' use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.  *Checkpoint Systems, Inc. v. Check point Software Technologies, Inc.*, 269 F.3d 270, 279 (3d Cir. 2001)*; Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir. 1990).

### Valid and Legally Protected Mark

Whereas here, the mark was not federally registered and has not achieved "inconstestability," the validity and legal protectability of the mark depends upon the proof of secondary meaning, unless the unregistered or contestable mark is "inherently distinctive." *Ford Motor Co. v. Summit Motor Products*, 930 F.2d 277, 291-292 (3d Cir. 1991)(citations omitted). Secondary meaning is demonstrated where, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." *Id.* at 292, quoting *Freixinet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir. 1984).  Although there is no real concensus on the necessary elements of secondary meaning, a non-exclusive list of factors which may be considered includes: the extent of sales and advertising leading to buyer association; length of use; exclusivity of use; the fact of copying; customer surveys; customer testimony; the use of the mark in trade journals; the size of the company; the number of sales; the number of customers; and actual confusion. *Id.,* citing *CIBA- GEICY Corp. v. Bolar Pharmaceutical Co. Inc.,* 747 F.2d 844, 852 (3d Cir. 1984)(other citations omitted).

As noted above, one exception to the secondary meaning analysis is where the mark is considered "inherently distinctive." *Id.*, citing *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142 (3d Cir. 1981).

"Inherently distinctive" marks, which qualify for protection even though they are not federally registered, are classified into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary (or fanciful). *A.J. Canfield Co. V. Hornickman,* 808 F.2d 291, 296 (3d Cir. 1986).

While generic terms function as the common descriptive name of a product class, descriptive terms describe a characteristic or ingredient of the article to which it refers. *Id.* at 296, citing *Keebler Co. v. Roviro Biscuit Corp.,* 624 F.2d 366, 374 (1st Cir. 1980). And, while suggestive terms suggest, rather than describe the characteristics of the goods, arbitrary terms bear no logical or suggestive relation to the actual characteristics of the goods. *Id.* Terms which are arbitrary or suggestive are treated as "inherently distinctive" and thus automatically qualify for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods. *Id.* citing *Keebler*, 624 F.2d at 374 n. 8. Mark terms which are descriptive may still be entitled to trademark protection, but only if the claimant proves that consumers identify the term with the claimant, because that identification proves secondary meaning. *Id.*

To establish whether a mark is suggestive, most courts rely on the "imagination test" under which a term is suggestive "if it requires imagination, thought or perception to reach a conclusion as to the nature of the goods." *Id.* at 297. A mark is descriptive if it conveys information about the product, its qualities, ingredients, or characteristics. *Id.* Because there is no logical or suggested relationship to its product, the mark "A-1" qualifies as an arbitrary or a suggestive mark, or at a minimum, it qualifies as a descriptive mark.

If a mark is descriptive, a plaintiff must establish it has acquired a "secondary meaning," in order to became valid and entitled to trademark protection. As mentioned hereinabove, the

11

Court may look to a non-exclusive list of factors to determine whether the mark has achieved "secondary meaning." *Ford Motor Co.*, 930 F.2d at 291-292; *see also*, *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC*, 212 F3d. 157, 165 (3d Cir. 2000)(to establish whether mark has achieved "secondary meaning," the Court considers: (1) the length and exclusivity of use of the mark; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by the plaintiff; (4) established place in the market; and, (5) proof of intentional copying).

In its motion for summary judgment and supporting documents, plaintiff has put forth evidence that "A-1 Mortgage," "A-1 Mortgage of Cranberry" and "A-1" trade names have achieved secondary meaning in the relative geographic area. Plaintiff has used the indicated trade names for nearly 10 years, and plaintiff's use of these trade names has been exclusive and continuous during that time. Further, as to the size or prominence of plaintiff's business and use of substantial advertising, plaintiff has set forth, through the affidavit testimony of Mr. Coyne (doc. no. 67 - exhibit 9), and Maria Makozy (president of A-1 Mortgage) (doc. no. 67 - exhibit 1), that A-1 has spent in excess of 4 million dollars on its advertising campaign, and that its trade names have become well known within the mortgage brokerage and financial services trade and the consuming public. Accordingly, this Court finds that plaintiff's marks have acquired secondary meaning in the relevant geographic area, and therefore, rise to the level of being valid and legally protected marks.

### Plaintiff Owns the Mark

Because plaintiff A-1 Mortgage is a Pennsylvania corporation which provides mortgage brokerage and financial services and is the exclusive owner of the trademark "A-1 Mortgage,"

12

which is registered under Pennsylvania Trademark Registration No. 3011052, it is indisputable that plaintiff owns the trademarks.

### **Likelihood of Confusion**

In *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983), the United States Court of Appeals for the Third Circuit set forth a list of relevant factors to determine likelihood of confusion. These factors, which are known as the *Lapp* factors, include:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;
(2) the strength of the owner's mark;
(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) the length of time the defendant has used the mark without evidence of actual confusion;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;
(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
(8) the extent to which the targets of the parties' sales efforts are the same;
(9) the relationship of the goods in the minds of consumers because of the similarity of functions; and
(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

*Lapp*, 721 F.2d at 463.

"Although the degree of similarity between the owner's mark and the alleged infringing mark is but one factor in the multi-factor confusion analysis, [Courts] have recognized that when products directly compete, mark similarity 'may be the most important of the ten factors in *Lapp*.'" *Checkpoint Systems, Inc.*, 269 F.3d at 281 (citations omitted). Marks are confusingly similar if the overall impression created by the marks is essentially the same. *Id*. A court must

13

compare the sound, appearance and meaning of the marks to determine whether they are confusingly similar. *Id.* (citations omitted).

This Court finds that the names "A-1 Mortgage" and "Day One Mortgage" sound so similar to one another that it is virtually impossible to distinguish between the two, especially over the radio. In fact, Mr. Coyne, mistook the "Day One" commercial for the "A-1" commercial. Further, both names have the number one and mortgage in the title, so their appearance is also confusingly similar.

After weighing the other *Lapp* factors, this Court finds that the majority of the factors (including the strength of the owners mark; the amount of time defendant has used the mark without actual confusion; the evidence of actual confusion; the intent of the defendant in using the mark; whether the services were advertised through the same geographic area; the extent to which the target of the parties' sale efforts are the same; and the relationship of the goods in the minds of consumers because of similarity of functions) weigh heavily in favor of plaintiff and against defendant.

The Court also recognizes that defendant was previously employed by A-1 Mortgage, and therefore, the intent of the defendant in adopting the mark "Day One Mortgage," and advertising in the same mediums, with virtually identical advertisements, weighs heavily on this Court's impression that defendant's use of plaintiff's trademark was done in bad faith and with the intent to directly compete with plaintiff. Merely by choosing the confusingly similar name "Day One Mortgage" this Court would find that defendant's intended to capitalize upon the reputation and goodwill of the "A-1 Mortgage" mark, but the fact that he conducted virtually identical means of advertising further establishes defendant's bad faith intent. Accordingly, under the facts as set

14

forth in plaintiff's unopposed motion for summary judgment, and even when viewing the facts in the light most favorable to the non-moving party, this Court finds that defendants' use of the marks has created a likelihood of confusion, and that such likelihood of confusion was intended by Goldblum.

Plaintiff has met its burden of proof on the merits of its trademark claim, under the Lanham Act, as it has demonstrated: (1) that the marks are valid and legally protectable; (2) the marks are owned by plaintiff; and, (3) defendants' use of the marks to identify goods or services is likely to create confusion.  *Checkpoint Systems, Inc.*, 269 F.3d 270.

**<u>Plaintiff is entitled to a permanent injunction, damages, costs and attorney's fees</u>**

This Court will grant plaintiff's request for permanent injunctive relief because plaintiff successfully established the elements of the cause of action and the merits of its case; there is no available remedy at law to prevent defendant from continuing to engage in violations of plaintiff's trademarks; and the balance of equities weighs in favor of granting a permanent injunction against defendants.  *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 850 (3d Cir. 1984).

Defendants are further liable to plaintiff in the amount of their gross profits which are, at a minimum, $72,000 for the time period in question.  Although plaintiff seeks an additional $50,000, and this Court recognizes that it may award, within its discretion, additional amounts where it finds that the amount of the recovery is inadequate, 15 U.S.C. § 1117(a), this Court will decline to do so here.

The Lanham Act further provides that "[t]he Court in exceptional cases may award reasonable attorney's fees to the prevailing party."  15 U.S.C. § 1117(a).  A case may not be

deemed exceptional, however, unless the losing party is guilty of subjective bad faith. *Ferrero USA, Inc. v. Ozark Trading, Inc.*, 952 F.2d 44, 47 (3d Cir. 1991). Because this Court has already found that defendant Goldblum acted with bad faith in using a confusingly similar mark, and his act of shifting his assets (his family home) to avoid a potential judgment further shows his knowledge that he had done something wrong, and that he was attempting to make himself judgment proof. Further, his actions during the course of the litigation have done nothing to help his cause. Accordingly, this Court finds that this case is one of exceptional circumstances where plaintiff, as the prevailing party, is entitled to reasonable attorney's fees and costs.

Plaintiff's counsel has supplied an affidavit supporting its claim for legal fees of approximately $44,458.50 through November, 2006, with anticipated fees of $13,775 for December, 2006, and costs of $3,150.21 (doc. no. 67 - exhibit 11). This Court finds, based upon its prior extensive litigation experience and its review of numerous fee petitions over the past four years as a district court judge, the hourly rate of $300 and the hours billed to be reasonable, and, therefore, this Court will award attorney's fees and costs in the amount of $61,383.71.

## V.  Conclusion

Accordingly, plaintiff's motion for summary judgment will be GRANTED (doc. no. 67), and judgment will be entered in favor of plaintiff and against defendants in the amount of $133,383.71.

An appropriate order follows.

                                                       s/Arthur J. Schwab  
                                                       Arthur J. Schwab  
                                                       United States District Judge

cc:    All counsel of record